## UNITED SHOE MACHINERY CORPORATION v. ATLAS TACK CORPORATION.

District Court, S. D. New York.

May 3, 1939.

Blair, Curtis, Dunne & Hayward, of New York City (Edward G. Curtis, of New York City, Victor Cobb and Walter P. Abell, both of Boston, Mass., and Charles C. Ladd, of New York City, of counsel), for plaintiff.

William L. Bainton, of New York City, (H. A. Baker and A. B. Bagley, both of Boston, Mass., of counsel), for defendant.

HULBERT, District Judge.

This is a patent suit to enjoin defendant and recover damages for alleged infringement of two United States Letters Patent, both issued to Sylvester Leo Gookin, March 4, 1930.

The alleged inventions relate to an improved shoe lacing device particularly adapted to invisible eyeleting and a method of inserting same in shoe uppers.

Plaintiff relies upon the following claims:

"6. An eyelet for invisible eyeleting having the end of its barrel formed to engage the stock at points removed from the lacing hole to facilitate pushing the stock, and having the portion of its barrel adjacent to its flange of a tapering formation and a substantial portion of its barrel toward its entering end shaped to embrace closely the pilot of the setting tool to cause the prongs formed when the eyelet bursts to curl outwardly and downwardly between adjacent layers of the stock as the prongs pass the clenching shoulder of the tool."

"8. An eyelet having a scored barrel the entering end of which is thickened throughout its circumference sufficiently to provide a work-engaging and surface considerably wider than the thickness of the material of the adjacent portion of the eyelet barrel."

"10. An eyelet having a barrel the entering end of which is formed with a bead shaped to push the stock of a shoe upper to force the outer layer of the stock past the shoulder of a setting tool.

"11. An eyelet having a substantial portion of its barrel toward its entering end of a non-tapering formation and having the end of its barrel formed to provide means for engaging the stock at points removed from the lacing hole."

"15. An eyelet having a flange and a barrel provided with a tapering portion extending from the flange part way to the entering end of the barrel and merging into a non-tapering portion extending substantially to the entering end of the eyelet barrel."

"17. An eyelet having a barrel, and a flange at one end of said barrel, said barrel being of substantially uniform diameter adjacent to its free end and then flaring at a considerable angle toward said flange for a distance such that the portion of the eyelet split and turned outwardly when the eyelet is set includes a substantial part of said flaring portion, whereby the minimum internal diameter of said eyelet is substantially increased during the setting operation." (Letters Patent #1,748,952)

"2. The improved method of setting eyelets in a plurality of layers of material which comprises inserting the pilot of a setting tool on one side of the layers of material, advancing an eyelet having a barrel thickened at its end to bring said thickened end of the eyelet barrel into engagement with the material on the other side outside of and adjacent to the hole in the material in which the eyelet is to be inserted, imparting to the eyelet and the setting tool the relative movement necessary to effect the setting of the eyelet and, in the course of such relative movement, forcing the thickened end of the eyelet barrel against the material, thus pushing the material along the pilot of the setting tool, and advancing the thickened end of the eyelet barrel through the layers of material into engagement with the layer nearest to the setting shoulder of the tool, meanwhile expanding the eyelet barrel so that the external diameter of the end of the eyelet barrel is maintained greater than the diameter of the hole in the layer nearest to the setting shoulder of the tool, and thrusting the thickened end of the eyelet barrel against that layer and thereby forcing that layer completely past said setting shoulder.

"3. The improved method of setting eyelets in a shoe upper which comprises inserting the pilot of a setting tool through the outer layer, the reinforcing material and the facing of said upper, advancing an eyelet having the end of its barrel deformed to provide effective engagement with the material of the shoe upper to bring the deformed end of the eyelet barrel into engagement with said facing at points removed from but adjacent to the hole in the upper through which the pilot of said setting tool passes, forcing the deformed end of the eyelet barrel against the facing and thereby pushing the upper materials along the pilot of the setting tool until the resistance which the upper materials offer to the passage of the deformed end of the eyelet barrel through the facing and reinforcing material is overcome, advancing the eyelet barrel through the facing and reinforcing material into engagement with the inner face of the outer layer at points removed from but adjacent to said hole, then pushing the outer layer completely past the setting shoulder of the tool by forcing the deformed end of the eyelet barrel against the inner face of the outer layer, and clenching the deformed end of the eyelet barrel between said outer layer and an adjacent layer of the upper."

"6. The improved method of inserting eyelets in a plurality of layers of material which comprises inserting a setting tool on one side of the layers of material, ad-

vancing an eyelet having the end of its barrel deformed to provide effective engagement with the face of the material to bring the end of the barrel into engagement. with the other side of the material at points removed from but adjacent to the hole in which the eyelet is to be inserted, imparting to the eyelet and the setting tool the relative movement necessary to effect the setting of the eyelet and in the course of such relative movement forcing the deformed end of the eyelet barrel against the material, thereby pushing the material toward the setting shoulder of the tool and ultimately forcing the layer nearest to the setting shoulder of the tool past said setting shoulder." (Letters Patent #1,748,951)

The defense is lack of patentability, anticipation and prior art.

The first and important issue presented is whether plaintiff's claimed inventions constitute a real discovery of merit, and the determination to be made is largely a matter of evidence.

An eyelet is a hollow cylindrical barrel made of metal, one end of which terminates in a spread out portion called a "flange".

The purpose of shoe eyelets it to protect lacing holes against wear, tear and distortion.

In shop practice, after the shoe upper had been stitched around the edges, it was presented to a machine which punched a hole and then forced the entering end of the eyelet through the leather. The prongs spread out and clenched the eyelet on the inside and the flange covered the exterior of the hole in the shoe upper. Because of the exposed position of the flange, this became known as "visible" eyeleting. These eyelets were set at the rate of 350 to 450 revolutions per minute.

The idea was later conceived of presenting the eyelet to the shoe upper from ·the inside so that the flange would rest against the foot of the wearer, and this became known as "invisible" or "blind" eyeleting.

Letters Patent #475,073 were issued to Anderson (May 17, 1892) but a substantial demand for invisible eyeleting did not manifest itself until 1912 or 1913.

Ordinarily, a shoe upper consists of three parts,—the outer leather, an inner lining, generally of leather, and between the two, a piece of stiffening material called an "eyelet stay",—the parts pasted or cemented and then stitched to hold their proper relative positions.

The process of setting invisible eyelets was, first, to present the upper to a machine which punched the holes through the three different parts of the upper. Then it was necessary to take the upper to another machine. The outside of the shoe upper had to be turned back to enable the operator to set the eyelets on the stay and this caused wrinkling and creasing of the leather. This became known as the "two-step" method.

Means were effected which avoided the disadvantage of the old fashioned two machine method and made possible the punching of the holes and the setting of the eyelets on a single machine, and this became known as the "one-step" method.

A great deal of difficulty was experienced with the setting of the eyelets under these methods.

Muther's Patent, #1,112,643, shows a combined punch and setting tool.

Doulett's Patent, #1,434,356, shows a separate punch and setting tool.

The setting tools of both the Muther and Doulett types improved conditions but left much to be desired. They avoided the · necessity of turning the shoe upper inside out, eliminating wrinkling and creasing of the leather, but the scored portion of the barrel did not always spread with precision and the prongs of the eyelet frequently misbehaved and clenched into the underside of the upper leather, instead of the stay, sometimes even protruding through the leather, distorting the hole. When the eyelet did not clench properly, ·there was some times a squashing or mashing effect, causing an unsightly appearance in the shoe. The efforts to remedy this situation upset operating conditions, resulting in a waste of material and time. These difficulties were attributable largely to the sharp edge or burrs upon the entering end of the eyelet. Successive efforts were made to overcome this difficulty by various improvements in the mechanism for setting the eyelets, but without success.

Gookin's earliest attempt resulting in a patent (#1,184,092) applied for in July, 1914, sought to make the setting shoulder adjustable with reference to the end of the pilot.

Kenway's Letters Patent, #1,271,720 (1914) proposed an expansible setting

member to be inserted in contracted condition to the desired position in the lacing hole and then expanded to form an effective eyelet-setting tool.

Shaw's Letters Patent, #1,271,721 (1915) modified the Kenway tool.

Hallam's Letters Patent, #1,271,722 (1915) proposed to reverse the position of the Kenway setting tool.

Glass' Letters Patent, #1,303,194 (1917) contemplated an expansible set with special accessory protective features.

Knight's Letters Patent, #1,297,695 (1917) sought to overcome the disadvantages of the Kenway patent.

Gookin's Letters Patent, #1,368,334 (1918) contrived a central boss or shoulder with an internal expanding member.

Miller's endeavor, Letters Patent #1,-436,186 (1918) was to get the outside shoe upper past the setting shoulder of the setting tool by a cam-lifted work table.

Rumney's Letters Patent, #1,538,005 (1921) devised a hollowed-out punch block to permit the eyelet setting tool to thrust downwardly an abnormal distance.

Godin's Letters Patent #1,612,280 (1921) arranged a swinging hammer to drive the leather upward over the shoulder.

Finally, Gookin determined that the solution of the problem lay in the character of the eyelet, and conceived an eyelet, the entering end of which was mechanically bent with uniformity and perfected a method for making its use effective, embodied in the patents in suit.

It was stipulated upon the trial that the plaintiff is the sole owner of the Letters Patent in suit, and that since January 1, 1936, and prior to the filing of the bill of complaint, defendant without license or permission by plaintiff did make, sell, and offer for sale in the United States eyelets for use in machines adapted to set invisible eyelets in the manner illustrated and described in Letters Patent #1,748,-951.

It is asserted by the defendant that it began to experiment as far back as 1914 to overcome the complaints regarding the use of sharp end eyelets. It had long been the practice to "tumble" eyelets in a barrel in varying quantities for the purpose of spreading lacquer or enamel, and polishing, and it was found that this practice had a tendency to dull the burrs or sharp edges and sometimes blunt or bend in the ends to a degree dependent upon the period of time the eyelets were tumbled, but that did not produce a uniform and satisfying result, and the acts claimed to have been performed by the defendants and alleged to constitute anticipation are not convincing or supported by contemporaneous proof.

My recollection of the testimony, as it was given upon the trial, months ago, refreshed by a thorough examination of the whole of the voluminous record, since the submission of exhaustive briefs, produces a conviction that there has been the usual unconscious straining of memory, without written record, carried back for two or more decades, except as defendant seeks to offer corroboration by the production of physical exhibits, including six hinged cards (of the apparent vintage of 1915) and a "Regal" sample shoe said to have been fabricated in 1920, the authenticity of which were not sufficiently established to make them of adequate probative force. It is well known in this branch of the law that the temptation to remember some times facilitates the case with which even honest witnesses may convince themselves, after the elapse of years, of having had a conception of a basis of a valuable patent, and has led to the rule that evidence to prove prior discovery must be clear and satisfactory. Barbed Wire Patent case, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177.

The oral evidence falls far short of overcoming the presumption of novelty from the granting of the patent. And I am not persuaded by the patents cited and relied upon by defendant as anticipatory.

The evidence is convincing that the problem concerning the industry in the production of a perfected eyelet for invisible eyeleting was solved by Gookin's eyelet, and the method for setting it. In fact, an examination of Letters Patent #1,612,442, issued upon application filed February 23, 1924 by George W. Jacques, assignor of the defendant, demonstrates that the defendant failed where the plaintiff's assignor succeeded.

The testimony of plaintiff's witness Baker, who, while in the employ of the defendant, made written reports upon the very subject matter of this litigation as it was then developing, and which said reports were produced from the defendant's

own records, established that the production, sale, and use of eyelets made and set in accordance with the Gookin patents, not only met with instantaneous approval, but prompted the defendant to undertake their immediate imitation.

There will be a decree sustaining the validity of both patents providing for a perpetual injunction, and a reference to determine the damages sustained by plaintiff and the profits derived by defendant upon its infringement unless the parties can agree upon the same between themselves. Submit findings of fact and conclusions of law in accordance with this opinion, and proposed decree to be entered thereon, with notice of settlement.